# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FREIDA GRAFF, Individually and as     :
Administratrix of the ESTATE OF         :
WILLIAM AYRES GRAFF JR., Deceased,   :
and PATRICIA BELIET, Daughter,        :     CIVIL ACTION
                                        :
            Plaintiffs,            :
                                        :
         v.                      :
                                        :
COUNTY OF BUCKS, et al.,        :
                                        :     No. 03-cv-1601
            Defendants.        :

## ORDER

        AND NOW, this ___ day of _____, 2006, upon consideration of the

Motion of Defendants County of Bucks, County Commissioners Fitzpatrick, Martin, and Miller,

Gordian Ehrlacher, Lewis Polk, M.D., Joan Crowe, R.N., Harris Gubernick, and Willis Morton

("Defendants") for Summary Judgment, and Plaintiffs' response thereto, it is hereby ORDERED

and DECREED that the Motion is GRANTED and Plaintiffs' claims against the County of

Bucks and the individual Defendants, in their official and individual capacities, are dismissed

with prejudice.

                                           BY THE COURT:


                                           _____
                                           Green, S.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FREIDA GRAFF, Individually and as      :
Administratrix of the ESTATE OF         :
WILLIAM AYRES GRAFF JR., Deceased,   :
and PATRICIA BELIET, Daughter,        :     CIVIL ACTION
                                      :
             Plaintiffs,       :
                                      :
       v.                       :
                                      :
COUNTY OF BUCKS, et al.,          :
                                      :     No. 03-cv-1601
               Defendants.     :

## <u>MOTION OF DEFENDANTS FOR SUMMARY JUDGMENT</u>

Defendants County of Bucks, County Commissioners Fitzpatrick, Martin, and

Miller, Gordian Ehrlacher, Lewis Polk, M.D., Joan Crowe, R.N., Harris Gubernick, and Willis

Morton (collectively "Defendants"), by and through their undersigned counsel, hereby move this

Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment. In

support of this motion, Defendants state as follows:

1.       On March 14, 2003, Plaintiffs, the wife and daughter of William Graff

("Graff"), a deceased former inmate of the Bucks County Correctional Facility ("BCCF"), filed a

complaint against the County of Bucks, Commissioners Fitzpatrick, Martin, and Miller, Gordian

Ehrlacher, Lewis Polk, M.D., Joan Crowe, R.N., Harris Gubernick, and Willis Morton, alleging

violations of the First, Eighth, and Fourteenth Amendment based on William Graff's

incarceration in BCCF.  (Docket entry no. 1).

2.       On September 8, 2005, Plaintiffs filed an amended complaint against the

original defendants adding certain averments of fact but maintaining the same theories of

liability.  (Docket entry no. 22).

3.       On December 7, 2005, this Court ordered that discovery must be

completed no later than February 15, 2006.  (Docket entry no. 30).

      4.    Plaintiffs' claims against the individual defendants under the Eighth Amendment fail because Plaintiffs cannot establish that any defendants were deliberately indifferent to a risk of serious harm to Graff.

      5.    Plaintiffs' claims against the County of Bucks under the Eighth Amendment fail because Plaintiffs cannot establish that the County had a custom, policy or practice that caused Graff to suffer a constitutional deprivation.

      6.    Plaintiffs' claims against Defendants also fail because Plaintiffs cannot establish that Graff's constitutional rights were violated.

      7.    Plaintiffs' claims against the individual defendants also fail because the individual defendants are entitled to qualified immunity.

      Defendants are therefore entitled to summary judgment.

      In further support of this Motion, Defendants incorporate by reference the attached brief.

                       Respectfully submitted,

 Date:  April 28, 2006                s/_____

                       Frank A. Chernak (Atty. I.D. No. 57602)
                       Jamie B. Lehrer (Atty. I.D. No. 89852)
                       Ballard Spahr Andrews & Ingersoll, LLP
                       1735 Market Street, 51st Floor
                       Philadelphia, PA 19103-7599
                       (215) 665-8500

                       Attorneys for Defendants County of Bucks, County Commissioners Fitzpatrick, Martin, and Miller, Gordian Ehrlacher in his individual capacity, Lewis Polk, M.D. in his individual capacity, Joan Crowe, R.N. in her individual capacity, Harris Gubernick and Willis Morton

Date:  April 28, 2006

s/_____
Carla P. Maresca (Atty. I.D. No. 77568)
Deasey, Mahoney & Bender, Ltd.
1800 John F. Kennedy Blvd., Suite 1300
Philadelphia, PA 19103
(215) 587-9400

Attorney for Defendants Gordian Ehrlacher
in his official capacity as Public Health
Administrator for Bucks County, Lewis Polk,
M.D. in his official capacity as the Director
for the Bucks County Health Department,
and Joan Crowe, R.N. in her official capacity
as Supervisor of the Dispensary of the Bucks
County Correctional Facility

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FREIDA GRAFF, Individually and as | : | |
| Administratrix of the ESTATE OF | : | |
| WILLIAM AYRES GRAFF JR., Deceased, | : | |
| and PATRICIA BELIET, Daughter, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| COUNTY OF BUCKS, et al., | : | |
| | : | No. 03-cv-1601 |
| Defendants. | : | |

# BRIEF OF DEFENDANTS IN SUPPORT
# OF THEIR MOTION FOR SUMMARY JUDGMENT

Frank A. Chernak (Atty. I.D. No. 57602)
Jamie B. Lehrer (Atty. I.D. No. 89852)
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599
(215) 665-8500

Carla P. Maresca (Atty. I.D. No. 77568)
DEASEY, MAHONEY & BENDER, LTD.
1800 John F. Kennedy Boulevard
Suite 1300
Philadelphia, PA  19103
(215) 587-9400

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS ..................................................................................... 3

        A.      Background Information ........................................................................... 3

                1.      The Facility ................................................................................... 3

                2.      Medical Services at BCCF ............................................................ 4

                3.      Environmental Conditions in BCCF ............................................. 9

        B.      Graff's Incarceration in BCCF .............................................................. 10

        C.      The Parties ............................................................................................. 18

                1.      The Medical Defendants ............................................................. 18

                2.      The County Defendants .............................................................. 19

III.    ARGUMENT ..................................................................................................... 20

        A.      Standard for Summary Judgment .......................................................... 20

        B.      Standard for Section 1983 Liability ...................................................... 21

        C.      Plaintiffs' Eighth Amendment Claim Fails. .......................................... 22

                1.      Plaintiffs Cannot Establish Deliberate Indifference. ................. 22

                2.      Plaintiffs Cannot Establish That The County Of Bucks Adopted
                        Policies, Practices Or Customs That Resulted In Graff's Alleged
                        Eighth Amendment Violation. .................................................... 26

                3.      Plaintiffs Cannot Prove That Graff Was Subjected To Cruel And
                        Unusual Punishment. .................................................................. 28

        D.      Plaintiffs' First Amendment Claim Fails. ............................................. 36

        E.      Plaintiffs' Fourteenth Amendment Claim Fails. ................................... 38

        F.      Plaintiffs' Section 1983 Claims Against The Individual Defendants
                Fail Because They Are Entitled To Qualified Immunity. ...................... 40

IV.     CONCLUSION .................................................................................................. 43

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FREIDA GRAFF, Individually and as | : | |
| Administratrix of the ESTATE OF | : | |
| WILLIAM AYRES GRAFF JR., Deceased, | : | |
| and PATRICIA BELIET, Daughter, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| COUNTY OF BUCKS, et al., | : | |
| | : | No. 03-cv-1601 |
| Defendants. | : | |

**BRIEF OF DEFENDANTS IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants County of Bucks (the "County"), County Commissioners Fitzpatrick,

Martin, and Miller, Gordian Ehrlacher, Lewis Polk, M.D., Joan Crowe, R.N., Harris Gubernick,

and Willis Morton (collectively "Defendants"), by and through their undersigned counsel, hereby

submit this brief in support of their Motion for Summary Judgment.

**I.   INTRODUCTION**

This is an inmate case in which William Graff, [1] a former inmate in the Bucks

County Correctional Facility ("BCCF"), died from liver failure caused by long term alcohol

abuse.  After at times consuming two quarts of beer per day, Graff was diagnosed with cirrhosis

of the liver in 1991 and end stage liver failure in June 1997.  On June 7, 2002, Graff died, with

the coroner reporting the cause of death as "[a]cute and chronic liver failure with severe nodular

cirrhosis."

Plaintiffs, the wife and daughter of Graff, seek to hold Defendants responsible for

---

[1]      All references to Graff mean William Graff.  Freida Graff is referred to as Plaintiff.

Graff's death, claiming that they violated Graff's First, Eighth, and Fourteenth Amendment rights by denying him necessary medical treatment and exposing him to inhumane conditions of confinement while he was incarcerated in BCCF.  Though Plaintiffs proffer a number of theories of liability, Plaintiffs' counsel conceded during oral argument that, "the real problem was the inadequacy of the medical care which violated the Eighth Amendment."  (See Excerpted Page of the Transcript of Oral Argument, dated 2/21/06 at 28, attached as Exhibit A at 28).

Plaintiffs' claims fail because Plaintiffs cannot prove the following:

1. the individual Defendants were <u>deliberately indifferent</u> to the health and safety of Graff;

2. the County had in place an official policy, practice, or custom that caused a constitutional deprivation;

3. Graff's conditions of confinement deprived him of the "minimal civilized measure of life's necessities";

4. Graff's medical treatment while incarcerated was so inadequate as to rise to the level of cruel and unusual punishment.

5. Graff suffered violations of his First and Fourteenth Amendment rights.

Furthermore, the individual defendants are entitled to the qualified immunity defense.  Plaintiffs' claims thus fail and Defendants are entitled to summary judgment.

II.   **STATEMENT OF FACTS**[2]

   A.   **Background Information**

      1.   **The Facility**

BCCF is a medium to maximum security prison located in Doylestown, Pennsylvania with a current total population of 666 prisoners.  (See Decl. of Harris Gubernick at ¶ 2, attached as Exhibit B).  BCCF is divided into ten cellblocks, referred to as modules.  (See id. at ¶ 3).  In addition to the modules, BCCF has several common areas to which the inmates are granted regular access, including a multi-purpose room, a library, a barber shop, a dining area, a commissary, an education room, an outdoor recreational area, and a dispensary.  (See id. at ¶ 4).

Upon admission to BCCF, inmates are given a comfort kit, which includes soap, a washcloth, a toothbrush, a cup, a pen, writing paper and envelopes.  (See Inmate Handbook at 2, attached as Exhibit C).  Inmates also receive an inmate handbook, setting forth the policies, rules and regulations in place at BCCF.  (See id. at 1).  They also are given two pairs of socks, one pair of sneakers, two pairs of underwear, two undershirts, two jumpers, a jacket, sheets, a towel, a pillow case and a blanket.  (See id. at 2).

At the time of Graff's incarceration, inmates in need of medical care were housed in G Module.  (See Dep. of William Nace dated 10/7/05 at 17-18, attached as Exhibit D). G Module was conveniently located next to the dispensary.  (See Facility Map, attached as Exhibit E).  It contained two tiers of cells, arranged in a U-shape around the module common

---

[2]   For purposes of this motion only, Defendants accept the "evidence in the light most favorable to the nonmovant, giving that party the benefit of all reasonable inferences derived from the evidence."  Waldron v. SL Indus., Inc., 56 F.3d 491, 496 (3d Cir. 1995)(citations omitted).

area.  (See Ex. B (Decl. of Gubernick) at ¶ 6).  Within the cells were a desk and chair, one or two

metal beds with vinyl covered mattresses, and a porcelain or metal sink and toilet.  (See id. at

¶ 7).  Within the module common area, to which inmates were granted regular access, were two

televisions, four couches, and several wooden game tables.  (See id. at ¶ 8).  There were also four

showers in G Module for inmate use and inmates had regular access to the module telephones.

(See id. at ¶ 9).[3]

### 2.    Medical Services at BCCF

The Bucks County Department of Health ("Department of Health") provides

medical services to inmates incarcerated in BCCF.  (See Excerpts from the Bucks County

Department of Health's Medical Manual at Responsible Health Authority (Standard J-1),

attached as Exhibit F).  It is the philosophy of the Department of Health to provide the best and

most appropriate quality of medical services to the inmates at BCCF and to meet and surpass the

national standards for correctional health care.  (See Ex. F (Excerpted Medical Manual) at

Medical Autonomy, General Orders and Personnel Guidelines for Bucks County Correctional

Medical Staff).  To ensure that these national standards are met, a Correctional Health Care

Committee meets on a quarterly basis to address any current medical problems and review and

---

[3]    In addition to the amenities and activities available to inmates within the module, inmates were
offered a variety of services in 2002.  They could participate in adult basic education classes to
obtain their General Equivalency Diploma.  (See Ex. B at ¶ 5; Ex. C at 17).  Tutoring was
available to inmates who needed it and computer assisted learning also was available to help
inmates participate in adult basic education classes.  (See id.).  BCCF facilitated drug and alcohol
counseling for inmates, of which Graff took advantage during his 2001 incarceration.  (See Ex. B
at ¶ 5; Ex. C at 8).  Inmates who chose to could attend religious services and take advantage of
religious counseling.  (See Ex. B at ¶ 5; Ex. C at 16).  There also were a number of community
volunteer groups with which BCCF established a relationship and that came to BCCF to provide
enrichment programs to inmates.  (See Ex. B at ¶ 5).  BCCF also established a visitation program
for inmates, whereby inmates were entitled to four hours of visitation each week.  (See Ex. B at
¶ 5; Ex. B at 8).  Additionally, counselors were available in each module to assist inmates with
their ongoing needs.  (See Ex. B at ¶ 5).

approve appropriate health care policies and procedures.  Health Services staff meetings are also held once a month to review the health care delivery system.  (See Ex. F (Excerpted Medical Manual) at Administrative Meetings and Reports).

Additionally, since 1982, the County has contracted with the National Commission on Correctional Health Care ("NCCHC"), an independent, non-profit organization sponsored by the American Medical Association, to audit the medical policies and practices in place and to inspect BCCF's dispensary.  The NCCHC has accredited the medical services provided to inmates in BCCF since 1985.  (See 2000 NCCHC Accreditation Report, attached as Exhibit G).  Significantly for this case, in its 2000 accreditation report, applicable for three years, the NCCHC found that BCCF's policies and procedures for receiving screenings, health assessments, handling of non-emergency medical requests, sick call, diagnostic services, continuity of care, emergency services, hospital and specialized ambulatory care, and environmental health and safety all met its national standards.  (See id.).  Demonstrating the force of NCCHC accreditation, the state Department of Corrections deferred to the NCCHC's findings when it conducted its inspection of BCCF in June 2002, reporting that, given its NCCHC accreditation, BCCF was within the state standards for medical and health services. (See 2002 State Inspection Report at 19, attached as Exhibit H).

### a.      Access to Medical Care

The Department of Health expends a significant amount of money to maintain the quality of health care at BCCF.  The Department of Health spent $3,059,975.00 in 2001 and $3,254,802.00 in 2002 for medical care at BCCF.  (See Prison Health Program, Cost Comparisons, attached as Exhibit I).  Despite the rising costs, it has always been the County's policy that no inmate will be denied necessary medical services, regardless of cost.  Indeed, though the state correctional institutions are authorized by statute to charge a fee for medical

services, no inmate at BCCF has ever been asked to reimburse the County for the cost of any

medical services provided.  See 61 P.S. § 1013.  (See Dep. of Joan Crowe, R.N. dated 10/10/03

at 209, attached as Exhibit J; Dep. of Gordian Ehrlacher dated 3/16/04 at 20, attached as

Exhibit K).

　　　　The medical dispensary at BCCF is open 24 hours a day, 7 days per week.

Physicians conduct health clinics five days per week.  In addition, a physician is always on call

24 hours a day, 7 days per week.  (See Ex. F (Excerpted Medical Manual) at Staffing Levels).

There is always a registered nurse present on-site at BCCF.  During weekdays, the dispensary is

staffed with three to four nurses, while in evening the dispensary is staffed with two nurses.

There is one nurse in the dispensary at night.  On the weekends, the day and evening shifts are

staffed with two nurses and the night shift with one.  (See id.).[4]

　　　　Should a medical issue arise that would be best addressed by a specialist, the

inmate is referred to an area specialist and/or Doylestown Hospital with whom the Department of

Health contracts.  A list of consulting physicians who specialize in cardiology, dermatology,

endocrinology, infectious disease, neurology, surgery, orthopedics, and pulmonary, to name a

few, is kept in the dispensary.  (See Ex. F (Excerpted Medical Manual) at Consultant Directory

for BCCF and MCCC/WCCC).  The decision to send an inmate to a specialist and/or hospital for

treatment is made solely by the medical staff.  (See Ex. F (Excerpted Medical Manual) at

Responsible Health Authority).

---

[4]　　　The Department of Health also provides dental services to the inmates at BCCF.  A dentist, as
well as a dental assistant, are available to the inmates 18 hours per week.  Further, a dentist is
always on call for emergencies.  (See id.).  There is also a podiatry clinic and optometrist clinics
available to the inmates.  (See id.).

After a medical screening by a corrections officer and classification counselor, each inmate undergoes a full health assessment immediately upon admission to BCCF. (<u>See</u> Ex. F (Excerpted Medical Manual) at Health Assessment). A nurse performs the initial screening of the inmate. The inmate is asked questions regarding his or her prior medical problems, current medications and physical condition. A physical assessment is also performed by the nurse. If an inmate is currently taking medications, the prescription is verified with the physician and an order for continued medication is obtained. If the inmate is taking psychiatric medications, a referral is made to Mental Health Services to verify the medication and to obtain an order from a psychiatrist for continued medication. (<u>See</u> <u>id.</u>). Within fourteen days of the inmate's incarceration, he or she is examined by a physician for a physical examination and review of medications. (<u>See</u> <u>id.</u>).

Also upon admission, inmates are instructed on the procedure to obtain medical treatment. (<u>See</u> Ex. F (Excerpted Medical Manual) at Information on Health Services; Ex. B (Inmate Handbook) at 6). To schedule an appointment with a nurse or doctor, inmates are instructed to sign the daily sick call list or to approach the nurse conducting sick call on their module. (<u>See</u> Ex. B (Inmate Handbook) at 7; Ex. J (Dep. of Joan Crowe) at 91-92). Inmates may also inform corrections officers if they are in need of medical services and the officers will contact the dispensary. Nurses conduct sick call on each module once per day, five days per week. (<u>See</u> Ex. F (Excerpted Medical Manual) at Sick Call Policy). In addition, a nurse dispenses prescription medication on each module three times per day, seven days per week. (<u>See</u> Ex. B (Inmate Handbook) at 7). Various "over the counter" medications, such as Advil, Tylenol, Maalox, and cough syrup are maintained by the corrections officers on each module to dispense to requesting inmates. (<u>See</u> <u>id.</u>).

### b.     PIMCC, Pre-Existing Conditions, and Pre-Certification

### (1)     PIMCC

The County, as well as 19 other counties in Pennsylvania, participate in a Prison Inmate Medical Cost Containment Program and Public Institution Medical Cost Containment Program ("PIMCC").  (See Dep. of Gordian Ehrlacher dated 10/12/05 at 7-11, attached as Exhibit L).  PIMCC is a spin-off of the County Commissioners Association of Pennsylvania (the "CCAP").  (See id. at 9).  The County became involved in PIMCC in 2001 because of concerns about rising health care costs.  (See id. at 10-11).  Notwithstanding these concerns, the County chose PIMCC because it believed that, under PIMCC, it would still provide quality medical care to inmates.  (See id. at 10).

PIMCC does not have the authority to set policies for the dispensary at BCCF, under either its contract or state law.  See 16 P.S. § 12010.  (See id. at 33-34).  It does, however, suggest certain language for policies and will send representatives to BCCF's quality control quarterly health care meetings.  (See Ex. L (Dep. of Ehrlacher) at 30, 33).  PIMCC also does not have the authority to decide which medical procedures will be conducted on inmates.  (See id. at 34).

### (2)     Pre-Existing Conditions

The dispensary at BCCF has inmates sign an Inmate Questionnaire upon their admission.  (See Inmate Questionnaire signed by William Graff, attached as Exhibit M).  The form provides the inmates' permission for a routine health screening by the medical staff at the BCCF.  (See id.).  The form also states that

> "[i]n the event that the County of Bucks pays for treatment of any pre-existing medical conditions, the County *may* seek reimbursement.  An assessment to determine insurance status of the inmate and the inmate's ability to pay will be taken into consideration if reimbursement is sought.  No medically necessary procedure will be denied by the County of Bucks."

(<u>Id.</u>).  The County has never implemented or enforced the pre-existing conditions policy.  (<u>See</u>

Dep. of Joan Crowe, R.N. dated 12/21/05 at 30-31, attached as Exhibit N).  In fact, when treating

inmates, the dispensary at BCCF does not even consider the fact that a condition may be pre-

existing.  (<u>See</u> <u>id.</u>).

### (3)     PIMCC Pre-Certification

While PIMCC has a process referred to as "pre-certification," the County medical

personnel view it as more of a notification process.  (<u>See</u> <u>id.</u> at 8, 46).  When the dispensary

sends an inmate to a consulting doctor or the hospital, it sends in a form to PIMCC.  (<u>See</u> <u>id.</u> at

8).  No inmate has been denied necessary medical care because of PIMCC's pre-certification

form or process.  (<u>See</u> Decl. of Gordian Ehrlacher at ¶ 8, attached as Exhibit O).

### 3.     Environmental Conditions in BCCF

To reduce the health risks typically associated with the housing of several

hundred individuals, the County had in place at the time of Graff's incarceration a number of

policies and practices to maintain sanitary environmental conditions in BCCF.  To ensure the

cleanliness of the modules, the inmates were required to clean their cells often.  (<u>See</u>

Communicable Disease Policy at 4, attached as Exhibit P; Ex. B (Inmate Handbook) at 14).

Cleaning supplies were regularly made available to the inmates.  (<u>See</u> Ex. B (Inmate Handbook)

at 14).  The corrections officers inspected the inmates' cells for cleanliness every day.  (<u>See</u>

Daily Inspection Sheets from G Module, attached as Exhibit Q).  So-called block runners, inmate

cleaning crews paid for their service, cleaned the modules on a daily basis using disinfectants.

(<u>See</u> Inmate Work Programs at 7, attached as Exhibit R).  The vents in the showers were cleaned

every day and the vents in the modules were regularly vacuumed.  (<u>See</u> Dep. of Willis Morton

dated 12/22/04 at 21, attached hereto as Exhibit S).  An air quality study was performed, which

indicated that the air quality in the facility was good.  (<u>See</u> <u>id.</u> at 21-22, 24).  If a maintenance

problem arose, the County had in place a contract with Aramark, whereby a member of the corrections staff would file a work order and Aramark would promptly address and fix the problem.  (See Ex. B (Decl. of Gubernick) at ¶ 10).

As a result of these sanitation policies, the state Department of Corrections found BCCF to be in compliance with the state's personal hygiene and safety and sanitation standards during its 2002 inspection of the facility, performed just eleven days after Graff's death.  (See Ex. H (2002 State Inspection Report) at 29).  In G Module, the Department of Corrections noted just peeling paint in the module showers, rusted dayroom ceiling vents, discolored walls and ceilings, and chipped paint on the cell doors.  (See id. at 5-6).  Indeed, G Module is generally known to be cleaner than the other modules in BCCF.  (See Dep. of Sergeant Doug Prendergast dated 5/26/05 at 73-74, attached as Exhibit T).

**B.     Graff's Incarceration in BCCF**

Between 1994 and 2001, William Graff was incarcerated in BCCF four times for driving under the influence.  (See Booking Sheets, attached as Exhibit U).  After pleading guilty to his fourth DUI charge on July 18, 2001, Graff was sentenced to 12 to 24 months, with a mandatory minimum sentence of 12 months.  (See Guideline Sentence Form dated 7/18/01, attached as Exhibit V).

Immediately upon his admission to BCCF on July 18, 2001, Graff was interviewed by a corrections officer, who asked him a series of medical-related questions and noted his observations of Graff's physical appearance.  (See Excerpts from Graff's Prison Medical File at Medical Questions on Admission Form, attached as Exhibit W).  He was then interviewed by a counselor, who again asked Graff a number of questions regarding his medical condition.  Graff identified as his then medical problems a broken hip which had been replaced just weeks before, triple bypass surgery, Hepatitis C, and cirrhosis of the liver.  (See Intake

Classification Summary, attached as Exhibit X).[5]  Given Graff's extensive medical concerns, he was given a "3" rating for his medical status, indicating to the dispensary staff that he was to be given highest priority.  (See id.; Dep. of Harris Gubernick dated 2/17/06 at 63-64, attached as Exhibit Z).  Graff was then assigned to G Module, the medical unit, where he was housed until his release.  (See Ex. W (Excerpts from Prison Medical File) at Medical Questions on Admission Form).

On September 5, 2001, Graff was released from BCCF to complete the remainder of his mandatory sentence on house arrest.  Graff was warned at that time that he was not permitted to ingest alcohol or controlled substances without a prescription while on house arrest.  (See Memorandum to House Arrestees signed by William Graff, attached as Exhibit AA).  To ensure that Graff followed these restrictions, Plaintiff also signed a contract agreeing to comply with the house arrest rules.  (See Key Rules of Confinement signed by Freida Graff, attached as Exhibit BB).

Despite these warnings, on May 9, 2002, Graff tested positive for marijuana use during a routine urine screen.  (See Misconduct Report dated 5/9/02, attached as Exhibit CC).  He pleaded guilty to ingestion of a controlled substance and failure to comply with the house arrest agreement and was sentenced to 30 days in BCCF.  (See Conduct Evaluation Board

---

[5]    In fact, Graff suffered from a number of serious medical conditions at the time of his incarceration.  He was diagnosed with Hepatitis C, cirrohosis of the liver, and end-stage liver failure in the 1990s.  (See Miscellaneous Medical Records at University of Pennsylvania Consultation dated 6/13/97, attached as Exhibit Y).  In 1997, Graff was diagnosed with coronary artery disease and underwent triple bypass surgery.  (See id. at Report of Robert L. Katz).  In June 2001, just weeks before his 2001 incarceration, Graff fell in his bathroom and fractured his hip, requiring a total hip replacement.  (See id. at Doylestown Hospital Physical/History dated 6/20/01).  At the time of his hip surgery, it was noted that Graff had end stage liver failure secondary to Hepatitis C and alcohol abuse with alcoholic hepatitis.  (See id. at Doylestown Hospital Consultation, Joseph Minissale, D.O.).  Indeed, in 2001, Graff admitted to drinking two quarts of beer a day.  (See id.).

Summary dated 5/15/02, attached as Exhibit DD).[6]  In response to Graff' sentence, Plaintiff

wrote a letter to the Parole and Probation Department requesting that Graff be returned to house

arrest and noting that, "William's health is very poor, cirrous [sic] of the liver, heart disease,

celluloses [sic] of the right leg and hip replacement."  (Letter from Freida Graff dated 5/13/02,

attached as Exhibit EE).

Upon Graff's readmission to BCCF on Thursday, May 9, 2002, he was again

immediately seen by a corrections officer, Sergeant Hugh Liverman.  Sergeant Liverman

conducted a physical examination of Graff to determine whether he was in any immediate

medical distress and noted his findings.  (See Ex. W (Excerpts from Prison Medical File) at

Medical Questions on Admission; Dep. of Sergeant Hugh Liverman dated 2/8/03 at 17-18,

attached as Exhibit FF).  Had Sergeant Liverman determined that Graff was in acute distress, he

would have contacted the dispensary immediately.  (See Ex. FF (Dep. of Liverman) at 17-18).

Aware that Graff was not a new commitment but rather a "beam back," an inmate returning from

house arrest, Sergeant Liverman did not complete the full medical interview conducted just

months before because Graff was still listed on the population count for BCCF.  (See id.; Ex. W

(Excerpts from Prison Medical File) at Medical Questions on Admission).  Rather, Sergeant

Liverman submitted a partially completed medical questionnaire to notify the dispensary staff

that Graff had returned to the facility.  (See Dep. of Michelle Mullin, R.N. dated 10/5/05 at 22,

attached as Exhibit GG).

Graff was also interviewed on May 9, 2002 by a counselor.  Again, because a full

assessment of Graff's classification was completed just months before, the counselor did not

---

[6]     Only Graff's incarceration from May 9, 2002 until his death on June 7, 2002 is at issue in this
case.

reclassify Graff. Rather, he asked him to list his current medical concerns and noted in Graff's case notes that he had problems with his hip and right leg, triple bypass and Hepatitis C. (See Cumulative Case Work/ Therapy Summary, attached as Exhibit HH). Given these medical concerns and his prior classification, Graff was again assigned to G Module. (See In/Out Logs, attached as Exhibit II).

Less than 24 hours later, Graff was seen by a registered nurse in the dispensary. (See Ex. W (Excerpts from Prison Medical File) at Progress Note dated 5/10/02). The nurse checked Graff's vital signs and weight, asked him for a list of his current medications, and scheduled him to see a doctor. (See id.; Ex. GG (Dep. of Mullin) at 27). When Graff could not recall what medications he was taking, the nurse asked that he call home and obtain that information. (See id.).

On Monday, May 13, 2002, Graff was seen by a second nurse in the dispensary for a medical history and physical assessment. (See Ex. W (Excerpts from Prison Medical File) at Medical History and Physical Assessment Form). He identified as his then current medical problems headaches, cirrhosis, triple bypass, hip replacement, Hepatitis C and cellulitis in his right leg. (See id.). The nurse again took Graff's vital signs and recorded in his chart the medications and dosages he was taking while on house arrest. (See id.). Thus, within four days of his readmission, Graff's medical condition was assessed by four people.

Beginning on May 19, 2002, Graff received Vasotec, a blood pressure medication, and Lasix, a diuretic. (See Ex. GG (Dep. of Mullin) at 28). He was examined by a physician on May 24, 2002, who added Aldectone, also used to control blood pressure and fluid retention, and potassium chloride. (See Ex. W (Excerpts from Prison Medical File) at Medical History and Physical Assessment Form, Order Sheet dated 5/24/02). Though the doctor found

Graff's physical examination to be within normal limits, he noted as his assessment of Graff's current medical condition "liver failure."  (See Ex. W (Excerpts from Prison Medical File) at Medical History and Physical Assessment Form).

From the time of his readmission on May 9, 2002 through May 31, 2002, Graff made no complaints about either his conditions of confinement or his medical care.  He did not submit any inmate request forms, used by inmates to notify prison officials of problems they may experience, nor did he sign up for sick call.  (See Dep. of Lillian Budd dated 11/22/05 at 6, attached as Exhibit JJ).  There is also no indication in the module log books, which were used to track announcements and inmate movements, needs or custody status, that Graff made any complaints during this time period.  (See Dep. of Christopher Lear dated 2/8/06 at 5-6, attached as Exhibit KK).  Indeed, as Plaintiff admits, though she spoke to Graff every other day, he never made any complaints during this period.  (See Dep. of Freida Graff dated 9/21/04 at 44-45, 69 attached as Exhibit LL).

On June 1, 2002, Graff reported that he fell in the shower and was experiencing hip pain.  (See Ex. W (Excerpts from Prison Medical File) at Progress Note dated 6/1/02).  A dispensary nurse examined Graff and sent him to Doylestown Hospital for x-rays and evaluation.  (See id.).  Graff was diagnosed by the emergency room physician with hip pain and a contusion of the right hip and iliac crest and was given a shot of Demerol and Phenergan, an antihistamine.  (See Doylestown Hospital Emergency Department Record, attached as Exhibit MM).  He was prescribed Tylenol #3, was told to follow up with his physician in one to three days, and was discharged from the hospital just an hour after his admission.  (See id.).

Upon his return to BCCF on June 1, 2002, Graff was placed on regular watch, meaning that he was observed by the module officer every fifteen minutes, and was offered ice

and Advil for his hip pain.  (<u>See</u> G Module Log Book at Entry dated 6/1/01 - 23:05 at 90,

attached as Exhibit NN; Ex. Z (Dep. of Gubernick) at 110; Ex. W (Excerpts from Prison Medical

file) at Progress Note dated 6/1/02).  He was scheduled for a follow-up check the next morning.

(<u>See</u> Ex. W (Excerpts from Prison Medical File) at Progress Note dated 6/1/02).

Graff was examined by a nurse the next day, on June 2, 2002.  (<u>See</u> Ex. W

(Excerpts from Prison Medical File) at Progress Note dated 6/2/02).  The nurse gave Graff ice

and ordered that his meal trays be delivered to his cell for one week.  (<u>See</u> <u>id.</u>; Ex. NN (G

Module Log Book) at Entry dated 6/2/02 - 10:15 at 92).  On the same day, Graff complained of

hip pain to the module officer, who recorded his complaint in the log book.  (<u>See</u> Ex. NN (G

Module Log Book) at Entry dated 6/2/02 - * at 94).  He also sent an inmate request form to

Lillian Budd, the Assistant Warden for Inmate Services, requesting that she help him move up

his parole date because "my hip is already starting to act up."  (<u>See</u> Inmate Request Form dated

6/2/02, attached as Exhibit OO).[7]  Assistant Warden Budd responded to Graff that she could not

grant his request because he failed to follow the house arrest regulations.  (<u>See</u> <u>id.</u>; Ex. JJ (Dep.

of Budd) at 34-35).

On June 4, 2002, Graff signed up for sick call, noting that he had fallen in the

shower on his bad hip.  (<u>See</u> Request for Medical Services Form, attached as Exhibit PP).  He

also complained to the module officer, Officer William Nace, that he was not feeling well and

experiencing hip pain during Officer Nace's rounds.  (<u>See</u> Ex. NN (G Module Log Book) at

Entry dated 6/4/02 - 10:30 at 99; Ex. D (Dep. of Nace) at 31-32).  Observing that Graff appeared

to be in pain, Officer Nace called the dispensary and reported Graff's complaint.  (<u>See</u> <u>id.</u>).

---

[7]     Just days earlier, Graff had asked Assistant Warden Budd to help him move up his parole date for
monetary reasons.

Graff sent an inmate request form to Assistant Warden Budd on June 5, 2002.  He informed her that he had slipped in the shower four days earlier and was experiencing pain.  He again asked her to help him move up his release date and told her that he was having trouble eating.  (See Inmate Request Form dated 6/5/02, attached as Exhibit QQ).  Later that day, Graff was examined by a doctor, Dr. Lewis Brandt, in the dispensary on June 5, 2002.  (See Ex. W (Excerpts from Prison Medical File) at Progress Note Dated 6/5/02).  Noting that Graff's x-ray at Doylestown Hospital was negative, Dr. Brandt added Flexeril, a muscle relaxant used for pain relief, to Graff's medication regimen and issued him a cane to help with his mobility.  (See Ex. W (Excerpts from Prison Medical File) at Order Sheet dated 6/5/02).

On June 6, 2002, in response to Graff's inmate request form, Assistant Warden Budd contacted the dispensary to ensure that the medical staff was aware of Graff's condition.  (See Ex. JJ (Dep. of Budd) at 37-38, 41-42, 44).  She was reassured by a dispensary staff member that they were aware of Graff's situation, that he had been to the hospital, that he had diagnosed with a contusion, and that the hospital had discharged him without restriction.  (See id. at 41-42).

On June 7, 2002, Nurse Linda Dunn, who was dispensing the noon medications on G Module, noted that Graff refused to take his medications.  (See Ex. W (Excerpts from Prison Medical File) at Progress Note dated 6/7/02; Dep. of Linda Dunn dated 4/12/05 at 67-68, attached as Exhibit RR).  The module officer, Officer Matthew Smith, also noted that Graff had not eaten his breakfast or lunch trays and was not feeling well.  He recorded his observations in the module log book between 12:02 and 12:25 p.m. and notified the dispensary.  (See Ex. NN (G Module Log Book) at Entry dated 6/7/02 - Late Entry at 109; Dep. of Matthew Smith dated 8/31/05 at 29, 31, attached as Exhibit SS).

Concerned, Nurse Dunn visited Graff in his cell at 2:36 p.m. (<u>See</u> Ex. NN (G Module Log Book) at Entry dated 6/7/02 - 14:36 at 110; Ex. W (Excerpts from Prison Medical File) at Progress Note dated 6/7/02; Ex. RR (Dep. of Dunn) at 67-69). She noted that Graff's leg was swollen and that he was having difficulty walking with a cane. (<u>See</u> <u>id.</u>). Nurse Dunn issued Graff a walker and moved him to a single occupancy cell closer to the module officer's podium. (<u>See</u> <u>id.</u>; Ex. NN (G Module Log Book) at Entry dated 6/7/02 - 15:00, 15:05, L/E at 110; Dep. of Christopher Lear dated 5/26/05 at 36-37, attached as Exhibit TT). It took Graff approximately one minute to walk the 30 to 40 feet between the cells with the help of the walker. (<u>See</u> Ex. TT (Dep. of Lear) at 52; Ex. T (Dep. of Prendergast) at 99; Ex. RR (Dep. of Dunn) at 108).

Graff was also placed on acute watch and assigned an inmate monitor, or "babysitter," to constantly observe his condition and help him with his meal trays and urinal. (<u>See</u> Ex. RR (Dep. of Dunn) at 70; Ex. NN (G Module Log Book) at Entry dated 6/7/02 - 15:05 at 110; Ex. TT (Dep. of Lear) at 37, 40). Beginning at 3:00 p.m., the babysitter and module officer observed Graff every five minutes and recorded Graff's activities on a log. (<u>See</u> Inmate Monitor Form, attached as Exhibit UU). Graff moved between his chair and bed for the next two hours. (<u>See</u> <u>id.</u>).

At 5:30 p.m., the babysitter noted that Graff was not responsive. (<u>See</u> <u>id.</u>). The module officer, Officer Christopher Lear, checked Graff's pulse and breath sounds and found none. (<u>See</u> Ex. TT (Dep. of Lear) at 65). He called a medical emergency, to which two nurses responded. (<u>See</u> Ex. NN (G Log Book) at Entry dated 6/7/02 - 17:38 at 111; Ex. W (Excerpts from Prison Medical File) at Progress Note dated 6/7/02 - 5:45). The nurses and a corrections officer performed CPR and administered the automated external defibrillator until the ambulance

arrived.  (See Dep. of Evelyn Barr, R.N. dated 4/12/05 at 9-11, 16, attached as Exhibit VV).

 Graff was transported to Doylestown Hospital, where emergency room staff worked on him for approximately six minutes before pronouncing him dead at 6:34 p.m.  (See Doylestown Hospital Records dated 6/7/02, attached as Exhibit WW).  The county coroner performed an autopsy and found that Graff had died of "[a]cute and chronic liver failure with severe nodular cirrhosis."  (Bucks County Coroner's Report, attached as Exhibit XX).[8]

### C. The Parties

 In addition to the County of Bucks, Plaintiffs sue a number of individuals in both their official and individual capacities, though they admit that they do not know who these individuals are.  (See Ex. LL (Dep. of Freida Graff) at 88-89).

### 1. The Medical Defendants

 From the Bucks County Department of Health, Plaintiffs name as defendants Gordian Ehrlacher, Lewis Polk, M.D., and Joan Crowe, R.N.

 During Graff's incarceration, Gordian Ehrlacher was the acting Director of the Bucks County Department of Health.  (See Ex. O (Decl. of Ehrlacher) at ¶¶ 3-4).  While acting in this capacity, Mr. Ehrlacher did not make any medical decisions pertaining to the medical treatment of inmates.  (See id. at ¶ 5).  Indeed, Mr. Ehrlacher had no contact with Graff or anyone acting on Graff's behalf, nor did he have knowledge of Graff's medical conditions or treatment, during Graff's 2002 incarceration.  (See id. at ¶ ¶ 9-13).

 Lewis Polk, M.D. was the previous Medical Director of the Bucks County

---

[8] Though Plaintiffs include a lengthy discussion of methicillin-resistant *Staphylococcus aureus* in their Amended Complaint and, at times, suggest that Graff was suffered from the disease, Plaintiff admits that Graff was never diagnosed with MRSA.  (See Ex. LL (Dep. of Freida Graff) at 66, 85).

Department of Health.  Dr. Polk officially retired from the position on October 1, 2003.  (See Ex. O at ¶ 2).  Due to health problems, there were periods of time in 2002 when Dr. Polk was on medical leave.  Significantly for this case, Dr. Polk was on medical leave from April 15, 2002 through August 15, 2002, which covers the entire period of Graff's 2002 incarceration.  (See id. at ¶ 3).

Joan Crowe, R.N. was and is today the supervisor of the dispensary of the BCCF. (See Dep. of Joan Crowe, R.N. dated 2/16/05 at 7, attached as Exhibit YY).  Nurse Crowe never treated or examined Graff during his incarceration.  (See id. at 92).  In fact, during the week of June 3-7, 2002, Nurse Crowe was conducting CPR certification at another location. (See id. at 105).  Defendant Crowe had no knowledge of Graff's purported medical condition, treatment or death until after Graff's death on June 7, 2002.  (See id.).

## 2.    The County Defendants

From the County and the Bucks County Department of Corrections, Plaintiffs name as defendants Michael Fitzpatrick, Charles Martin, Sandra Miller, Harris Gubernick, and Willis Morton.

At the time of Graff's incarceration, Defendants Fitzpatrick, Martin and Miller were the Commissioners for the County of Bucks, elected and vested with authority over the day-to-day operations and administration of the County as set forth in 16 P.S. § 501, *et seq.*[9]

Defendant Gubernick was the acting Director of the Bucks County Department of Corrections.  (See Ex. Z (Dep. of Gubernick) at 8).  In this position, Defendant Gubernick directly supervised the warden, superintendent and other administrative staff.  (See id. at 15).  He

---

[9]    Defendants Martin and Miller remain County Commissioners today.  Defendant Fitzpatrick is now a United States Congressman representing the 8th District of Pennsylvania.

also oversaw the planning for the department, though his objectives were more targeted as acting

director than they were when he assumed the director position.  (See id. at 14).  During Graff's

incarceration, Defendant Gubernick had no contact with Graff or anyone acting on Graff's

behalf, nor did he hear of any complaints or concerns that Graff may have had regarding his

medical care or conditions of confinement.  (See Ex. B at ¶ ¶ 11-16).

Defendant Morton was the acting Warden for BCCF at the time of Graff's

incarceration.  (See Decl. of Willis Morton dated 4/27/06 at ¶ 1, attached as Exhibit ZZ).  As

Warden, Defendant Morton was responsible for the oversight of the safety and custody of the

inmates in BCCF and the supervision of the corrections staff.  During Graff's incarceration,

Defendant Morton had no contact with Graff or anyone acting on Graff's behalf, nor did he hear

of any complaints or concerns that Graff may have had regarding his medical care or conditions

of confinement.  (See id. at ¶ ¶ 3-8).

## III.   ARGUMENT

### A.   Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure is designed to secure a just,

speedy and inexpensive determination.  See Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

Pursuant to Rule 56(c), a court should enter summary judgment when the record reveals that

"there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 250-52 (1986).  An issue is genuine only if the evidence is such that a reasonable

jury could find for the non-moving party.  See id. at 251.  The non-moving party cannot escape

summary judgment by introducing "a more scintilla of evidence" in her favor or by relying on

"conclusory allegations, improbable inferences, and unsupported speculation." Sarko v. Penn-

Del Directory Co., 968 F. Supp. 1026, 1031 (E.D. Pa. 1997)(citation omitted); J. Geils Band

Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1251 (1st Cir. 1996).

> **B.      Standard for Section 1983 Liability**

Plaintiffs attempt to present a cause of action pursuant to 42 U.S.C. § 1983, which states:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage of any State . . . subjects, or causes to
> be subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity,
> or other proper proceeding for redress.

42 U.S.C. § 1983 (1988).  Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred . . . ."  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).  Thus, in order to establish a claim under Section 1983, Plaintiffs must prove by a preponderance of the evidence that the conduct committed by one acting under color of state law deprived Graff of rights, privileges, or immunities guaranteed by the Constitution.  See Parratt v. Taylor, 451 U.S. 527, 535 (1981).

Liability under Section 1983 cannot be premised on a theory of *respondeat superior*.  See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Mitchell v. Grooms, No. 87-6958, 1988 U.S. Dist. LEXIS 4095, at *2-3 (E.D. Pa. May 10, 1988)(Green, J.)(dismissing as frivolous the plaintiff's claims against the mayor, district attorney and medical director because, "Plaintiff offers no facts to suggest that these defendants directly participated in the events giving rise to the complaint . . .  The mere fact that Goode is Mayor of Philadelphia, Castille is District Attorney and Williams is Director of Medical Services is insufficient to find them liable as there is no respondeat superior liability in § 1983 cases").  Rather "each named defendant must be shown . . . to have been personally involved in the events or occurrences alleged by the plaintiff to be unlawful."  Anderson v. Bureau of Prisons, No. 05-4560, 2006 U.S.

App. LEXIS 9034, at *5 (3d Cir. Apr. 11, 2006)(citing <u>Rode</u>, 845 F.2d at 1207)(Non-Precedential).

     **C.**    <u>**Plaintiffs' Eighth Amendment Claim Fails.**</u>

         **1.**    **Plaintiffs Cannot Establish Deliberate Indifference.**

In order to overcome summary judgment in an Eighth Amendment case, a plaintiff must show that prison officials were deliberately indifferent to a substantial risk of serious harm. <u>See</u> <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 130-32 (3d Cir. 2001)(construing the leading Supreme Court case, <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994), which establishes the deliberate indifference standard in Eighth Amendment cases).  "Farmer rejected an objective test for deliberate indifference; instead it looked to what the prison official actually knew rather than what a reasonable official in his position should have known." <u>Id.</u> at 131.  Under <u>Farmer</u>, the knowledge element of a prison official is subjective.  <u>See id.</u> at 133.  Even if a plaintiff marshals evidence to infer that the risk of harm is obvious (and therefore imputed to the prison official), the official "always must have the opportunity to show that he was unaware of the risk." <u>Id.</u> at 132.

To show deliberate indifference, <u>Farmer</u> requires that a prison official have <u>actual knowledge</u> of the substantial risk of serious harm.  <u>See id.</u>  This standard is a "high one." <u>Id.</u> at 137.  In other words, to overcome summary judgment, a plaintiff "must present enough evidence to support the inference that the defendants 'knowingly and unreasonably disregarded an objectively intolerable risk of harm.'" <u>Id.</u> at 132.

For example, in the recent case of <u>Counterman v. Warren County Correctional Facility</u>, the Third Circuit affirmed the grant of summary judgment in favor of prison officials and employees in an Eighth Amendment sexual assault and harassment case where the plaintiff failed to prove deliberate indifference on the part of the individual defendants.  <u>See Counterman</u>

<u>v. Warren County Corr. Facility</u>, No. 05-1572, 2006 U.S. App. LEXIS 9031, at *16 (3d Cir. Apr. 11, 2006)(Non-Precedential).  The plaintiff had been subjected to the following indignities at the hands of fellow inmates:  he was physically assaulted, he was stripped and forced to run in the block naked, the inmates threw garbage cans of hot and cold water at him, the inmates rubbed their genitals on him, and ultimately, several inmates violently dragged him into a cell, held him down, and sodomized him using a lotion bottle.   <u>See</u> <u>id.</u> at *2-3.  While the Third Circuit noted its sympathy and outrage at the treatment of Counterman, the court concluded that Counterman lacked an Eighth Amendment claim because, at best, he showed "negligence, which unfortunately, does not suffice where the deliberate indifference standard applies."  <u>Id.</u> at *16.

The Third Circuit ruled that Counterman failed to show deliberate indifference on the part of the individual defendants even though he provided the following facts against Officer Bowlby: (1) an inmate testified that another inmate told stories to defendant Officer Bowlby about what he did to Counterman the night before and Bowlby would laugh and state that Counterman should not take it and should stand up for himself; and (2) Officer Bowlby laughed when other inmates referred to Counterman as a "punk and a pussy and bitch."  <u>Id.</u> at *8-9.  The court concluded that these facts would not be sufficient to establish Bowlby's subjective awareness of the excessive risk of harm to Counterman's safety because these facts do not prove that "Bowlby <u>must</u> have known of the intolerable danger to Counterman . . . ."  <u>Id.</u> at *9. Similarly,  Counterman's claim against Officer Wiseburn failed even though Wiseburn told Counterman he knows what is going on and that Counterman has to fight back.  <u>Id.</u> at *10-11.

Numerous Third Circuit cases have similarly dismissed Eighth Amendment claims because the plaintiffs failed to satisfy their "high burden" of proving deliberate indifference on the part of the individual defendants.  <u>See</u> <u>Jones v. Beard</u>, No. 04-3669, 2005

U.S. App. LEXIS 17949, at *4-8 (3d Cir. Aug. 19, 2005)(Non-Precedential)(affirming grant of summary judgment in favor of corrections officials and guards because the inmate failed to prove deliberate indifference even though the inmate made oral and written complaints to the guards that he was not getting along with an inmate with mental illness who eventually attacked him); see also Dubois v. Abode, No. 04-4682, 2005 U.S. App. LEXIS 15466, at *4-6 (3d Cir. Jul. 27, 2005)(Non-Precedential)(dismissing frivolous appeal because inmate could not show deliberate indifference to his serious medical needs (back and rib injuries and eye condition) on the part of the individual defendants); Heggenmiller v. Edna Mahan Corr. Inst. for Women, No. 04-1786, 2005 U.S. App. LEXIS 6067, at *14-15 (3d Cir. Apr. 11, 2005)(Non-Precedential)(affirming grant of summary judgment because inmates failed to show that the prison administrator defendants knew of a substantial risk of inmates being raped or sexually assaulted by a guard even though the inmates produced evidence of up to ten incidents of prior incidents between the guards and inmates, citing Beers-Capitol).

Here, because Plaintiffs cannot prove that any of the individual defendants were deliberately indifferent to a serious risk of harm to Graff, they cannot satisfy the high burden of proof imposed upon them by Farmer and Beers-Capitol.  Their claims against the individual defendants therefore fail as a matter of law.

When asked to identify evidence that each of the individual defendants were aware of William Graff's medical conditions and conditions of confinement, Plaintiffs stated simply that, "they all should of all had his history of health because he was in prison numerous times . . . they've seen him, it's not like he was new to them" and "if they weren't aware they should have been aware because he needed medical attention."  (Ex. LL (Dep. of Freida Graff) at 78-79; Dep. of Patricia Balliet dated 9/21/04 at 29, attached as Exhibit AAA).  Indeed, both

Plaintiffs admitted that Graff never mentioned having contact with any of the named defendants, nor did they even know the names of the individual defendants.  (See Ex. LL (Dep. of Freida Graff) at 79-80; Ex. AAA (Dep. of Balliet) at 29-30).

This admission is not surprising, for none of the individual defendants had any contact with or knowledge of Graff during his incarceration.  (See Ex. O (Decl. of Ehrlacher) at ¶¶ 9-13; Ex. YY (Dep. of Crowe) at 92, 105; Ex. B (Decl. of Gubernick) at ¶¶ 11-16; Ex. ZZ (Decl. of Morton) at ¶¶ 3-8).  Indeed, Dr. Polk was not even holding his position at the time of Graff's incarceration.  (See Ex. O (Decl. of Ehrlacher) at ¶ 3).  Plaintiffs cannot point to any evidence that the County and prison officials they named as defendants had any knowledge of Graff himself, let alone of a serious risk of harm to Graff, during his incarceration.  Absent such actual knowledge, the individual defendants did not have the requisite deliberate indifference necessary to be held liable under Beers-Capitol and its progeny.  Plaintiffs' Eighth Amendment claims as to the individual defendants therefore fail.

Further, Defendants Fitzpatrick, Martin, Miller, Gubernick, and Morton, as non-medical defendants, could not have been deliberately indifferent to any risk of harm posed by Graff's medical conditions and treatment.  The Third Circuit has held that, "[i]f a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."  Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).  The court further explained that, "absent a reason to believe . . . that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."  Id.; see also Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993)(affirming the grant of summary judgment for the non-medical defendants because "[n]either of these defendants . . . is a

physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaint of a prisoner who was already being treated by the prison doctor").

Like the defendants in the cases cited above, Defendants Fitzpatrick, Martin, Miller, Gubernick, and Morton relied on the expertise of the dispensary staff to diagnose and treat Graff's medical needs. They had neither the authority nor the expertise to intervene in or override the decisions of the dispensary staff regarding Graff's medical treatment, nor were they ever made aware that Graff was having medical problems. Contrary to Plaintiffs' assumption, the non-medical defendants did not review, nor did they even have access to, inmates' medical files. (See Ex. Z (Dep. of Gubernick) at 116-117, 123; Ex. F (Excerpted Medical Manual) at Sharing Health Information). The non-medical defendants were therefore entitled to defer to the judgment of the dispensary staff with regard to Graff's medical treatment and cannot be found deliberately indifferent for doing so.

With no evidence of deliberate indifference to a serious risk of harm to Graff on the part of any of the individual defendants, Plaintiffs' Eighth Amendment claims as to them fail as a matter of law.

### 2. Plaintiffs Cannot Establish That The County Of Bucks Adopted Policies, Practices Or Customs That Resulted In Graff's Alleged Eighth Amendment Violation.

To hold a municipality liable under Section 1983, a plaintiff must prove that the municipality had in place a policy, practice or custom that caused the deprivation of a constitutional right. See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 691-95 (1978). Section 1983 liability cannot be premised on a theory of *respondeat superior*. See id. at 691. Rather, "it is only when the execution of the government's policy or custom . . . inflicts the injury that [a] municipality may be held liable under § 1983." City of Canton v. Harris, 489 U.S.

378, 385 (1989)(quotation omitted).  Indeed, "[p]roof only of the existence of an unlawful policy

or custom is not sufficient . . . to impose municipal liability under section 1983.  A plaintiff must

also establish that the government policy or custom was the proximate cause of the injuries

sustained."  Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996)(citation omitted).

   A policy is made "when a decisionmaker possess[ing] final authority to establish

municipal policy with respect to the action issues an official proclamation, policy or edict."

Kneipp, 95 F.3d at 1212 (quoting Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996).  A

custom may be established only by evidence that a practice, although not authorized by law, is so

permanent and well-settled as to virtually constitute law.  See Beck v. City of Pittsburgh, 89 F.3d

966, 971 (3d Cir. 1996).  To prove a "custom," the plaintiff must establish "that policymakers

were aware of similar unlawful conduct in the past, but failed to take precautions against future

violations, and that this failure . . . led to [plaintiff's] injury."  Id. at 972.  The Third Circuit has

clarified that a policymaker is an "official [with] final, unreviewable discretion to make a

decision or take action."  Kneipp, 95 F.3d at 1213 (quoting Andrews v. City of Phila., 895 F.2d

1469, 1481 (3d Cir. 1990)).

   Significantly, Plaintiffs fail to identify whom they allege is a "policymaker" for

purposes of municipal liability, instead referring simply to "Defendants."  Assuming that

Commissioners Fitzpatrick, Martin and Miller are the policymakers for the County, Plaintiffs

point to just one policy or practice deliberately undertaken by the County Commissioners in their

amended complaint  --  participation in the PIMCC program.  Yet, as this Court properly held in

Preston v. Correctional Medical Services, "no finder of fact could reasonably determine that [a

cost containment of policy] could lead to the inference that CMS had a policy of wanton or

deliberate indifference to Plaintiff's serious medical needs."  Preston v. Correctional Med. Serv.,

No. 89-2197, 1992 U.S. Dist. LEXIS 4141, at *7-8 (E.D. Pa. Mar. 24, 1992).  Mere participation

in a cost management program cannot itself, then, constitute deliberate indifference.

Plaintiffs fail to proffer any evidence, other than their own unsupported

allegations, that the County Commissioners knew that participation in the PIMCC program could

create a serious risk of harm to Graff, nor can they prove that the County Commissioners were

aware that participation in PIMCC had caused similar alleged violations in the past.  Indeed,

BCCF's medical services have been accredited by the NCCHC since 1985.  Courts have relied

on NCCHC accreditation to grant summary judgment for prisons on claims of constitutionally

inadequate medical care.  See Williams v. Cerlock, 993 F. Supp. 1192, 1197 (C.D. Ill. 1998); see

also Tumath v. County of Alamed, No. C 95-3289, 1996 U.S. Dist. LEXIS 16845, at *6 (N.D.

Cal. Nov. 6, 1996).

Without evidence that the County Commissioners knew that participation in

PIMCC caused the type of constitutional deprivations that Plaintiffs here allege, Plaintiffs cannot

prove the "scienter-like evidence of indifference on the part of an official with policymaking

authority" necessary to hold the County liable for Graff's alleged Eighth Amendment violations.

Beswick v. City of Phila., 185 F. Supp. 2d 418, 427 (E.D. Pa. 2001)(quoting Simmons v. City of

Phila., 947 F.2d 1042, 1060-1061 (3d Cir. 1991)).

> **3.      Plaintiffs Cannot Prove That Graff Was Subjected To Cruel And
> Unusual Punishment.**
>
> **a.      Plaintiffs Cannot Prove That Graff's Environmental
> Conditions During His Incarceration Amounted To Cruel And
> Unusual Punishment.**

When determining whether conditions of confinement constitute cruel and

unusual punishment, courts consider whether the conditions "involve the wanton and

unnecessary infliction of pain [or are] grossly disproportionate to the severity of the crime

warranting imprisonment." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  However, "[t]he

Constitution . . . does not mandate comfortable prisons . . . and only those deprivations denying

the minimal civilized measure of life's necessities . . . are sufficiently grave to form the basis of

an Eighth Amendment violation."  Wilson v. Seiter, 501 U.S. 294, 298 (1991)(quoting Rhodes,

452 U.S. at 347-349).  In Seiter, the Supreme Court clarified that, to establish that prison

conditions amount to cruel and unusual "punishment," a plaintiff must satisfy a two part test:

(1) an objective component, considering whether the conditions were sufficiently serious to

amount to a violation of the Eighth Amendment; and (2) a subjective component, considering

whether the prison officials acted with "deliberate indifference" when imposing or failing to

remedy such conditions.  See Seiter, 501 U.S. at 298, 303.

      Clarifying the objective component of the Seiter test, the Third Circuit considers

the following objective criteria, originally set forth in Justice Brennan's concurrence in Rhodes:

> lighting, heat, plumbing, ventilation, living space, noise levels,
> recreation space . . . control of vermin and insects, food
> preparation, medical facilities, lavatories and showers, clean places
> for eating, sleeping and working . . . protection from violent,
> deranged or diseased inmates, fire protection, emergency
> evacuation . . . clothing, nutrition, bedding, medical, dental and
> mental health care, visitation time, exercise and recreation,
> educational and rehabilitative programming . . . trained and
> adequate guards and other staff, avoidances of placing inmates in
> positions of authority over other inmates . . .

Peterkin v. Jeffes, 855 F.2d 1021, 1025 n.7 (3d Cir. 1998).  District courts are to consider such

criteria alone or in combination to determine if they meet the objective prong of the Seiter test.

See id.

      For example, courts within this circuit have consistently held that conditions

similar to, and indeed far worse, than those to which Graff was allegedly exposed do not satisfy

the objective prong of the Seiter test and therefore do not rise to the level of cruel and unusual

punishment.  In <u>Blackiston v. Vaughn</u>, the court held that lack of heat and hot water for a period

to twenty days in December was not sufficiently serious to constitute cruel and unusual

punishment.  See <u>Blackiston v. Vaughn</u>, No. 95-cv-3740, 2002 U.S. Dist. LEXIS 16261, at *7-9

(E.D. Pa. Aug. 20, 2002)(granting defendants' motion for summary judgment).  Similarly, in

<u>Boulware v. Hill</u>, the court held that an inmate did not suffer cruel and unusual punishment when

he bit into the head of his mouse inadvertently placed in his lunch.  See <u>Boulware v. Hill</u>, No.

98-3876, 2000 U.S. Dist. LEXIS 15602, at *6-8 (E.D. Pa. Oct. 24, 2000)(granting defendants'

motion to dismiss).  In <u>Wilson v. Horn</u>, the court held that, even when considered in

combination, an inmate's complaints that his cell was infested with vermin, had a broken

window, was cold in the winter and was extremely noisy did not amount to cruel and unusual

punishment.  See <u>Wilson v. Horn</u>, 971 F. Supp. 943, 946 (E.D. Pa. 1997)(granting defendants'

motion for summary judgment); <u>see also</u> <u>Vickers v. Vaugh</u>, No. 96-2420, 1997 U.S. Dist. LEXIS

14679, at *9-10 (E.D. Pa. July 24, 1997)(granting summary judgment for defendants and holding

that the plaintiffs' complaints that their cells were cold and damp, that their vents leaked and that

they had no hot water did not amount to cruel and unusual punishment . . .); <u>Briggs v.</u>

<u>Heidlebaugh</u>, No. 96-3884, 1997 U.S. Dist. LEXIS 7673 at *8-9 (E.D. Pa. May 21,

1997)(granting summary judgment for defendants and holding that plaintiff's denied access to

toilet paper for two days, a shower for two weeks, clean clothing and towels for five days and

meals other than bread and cheese for seventy-two hours while he was confined to restricted

housing did not amount to constitutional violations); <u>Kemp v. Hatcher</u>, No. 96-7, 1996 U.S. Dist.

LEXIS 15741, at *8-11 (E.D. Pa. Oct. 25, 1996)(granting summary judgment for defendants on

plaintiff's cruel and unusual punishment claim because evidence that plaintiff's cell had no

windows, inadequate light and ventilation, no heat, insect infestation, a leaking roof and a toilet

that overflowed was insufficient to prove a constitutional violation, especially given evidence that defendants regularly addressed and repaired maintenance problems in the facility).

Here, though Plaintiffs make reference to roof and cell leaks and dirty showers and vents in their amended complaint, their counsel admitted during oral argument on February 21, 2006 that, "the real problem was the inadequacy of the medical care which violated the Eighth Amendment."  (See Ex. A (Excerpted Transcript of Oral Argument) at 28).  Indeed, Plaintiffs admitted during their depositions that, despite numerous telephone conversations with Graff during his 2002 incarceration, he never complained about the environmental conditions in G Module as they were then, nor is there any record that Graff submitted Inmate Request Forms regarding the conditions of his confinement.  (See Ex. LL (Dep. of Freida Graff) at 69; Ex. AAA (Dep. of Balliet) at 27-28).

To the extent that Plaintiffs rely on the 2002 state Department of Corrections inspection report to establish their conditions claim, they fare no better.  The inspection report, based on an inspection of the facility conducted just eleven days after Graff's death, noted only peeling paint in the module showers, rusted day room ceiling vents, discolored walls and ceilings, and chipped paint on the cell doors in G Module.  (See Ex. H (2002 Inspection Report) at 5-6).  The report noted that BCCF was in compliance with the state's personal hygiene and safety and sanitation standards.  (See id. at 18, 29).  These issues are a far cry from those contemplated by the Court in Seiter.  Indeed, as Sergeant Prendergast testified, Graff's module was one of the cleanest in the facility.  (See Ex. AA (Dep. of Prendergast) at 73-74).

Because Plaintiffs cannot prove that Graff's environmental conditions "den[ied] [him of] the minimal civilized measure of life's necessities," Plaintiffs' conditions claim fails as a matter of law.  Wilson, 501 U.S. at 298.

      **b.**     **Plaintiffs Cannot Prove That Graff's Medical Care Was So Inadequate As To Rise To The Level Of Cruel And Unusual Punishment.**

In <u>Estelle v. Gamble</u>, the Supreme Court of the United States established a test for determining whether a prisoner's Eighth Amendment rights had been violated due to a denial of medical care. <u>Estelle v. Gamble</u>, 429 U.S. 97, 105 (1976). The Eighth Amendment proscribes punishments which "involve the unnecessary and wanton infliction of pain[.]" <u>Id.</u> at 103. In order to constitute a violation of the Eighth Amendment's proscription on "unnecessary and wanton infliction of pain," a prisoner must allege acts or omissions that satisfy a two prong test. A plaintiff must establish that (1) prison officials manifested a deliberate indifference (2) to serious medical needs of the prisoner. <u>See id.</u> at 104.

With this stringent standard in mind, courts have repeatedly held that more than medical negligence or carelessness is required in order for the alleged conduct to rise to the level of "deliberate indifference." <u>See</u> <u>Estelle</u>, 429 U.S. at 106 ("a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"); <u>Henderson v. Umar</u>, No. 88-6915, 1989 U.S. Dist. LEXIS 7083, at *7 (E.D. Pa. 1989)("[m]ere neglect, carelessness, or medical malpractice do not amount to 'deliberate indifference.'"). Generally, negligence never supports a cause of action under Section 1983. <u>See</u> <u>Daniels v. Williams</u>, 474 U.S. 327, 333 (1986). Similarly, a disagreement with medical treatment provided fails to support a claim based on Section 1983. A prisoner's right to receive medical care never extends to the type of medical care which the prisoner personally desires. <u>See</u> <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754 (3d Cir. 1979).

For example, in <u>Outterbridge v. Commonwealth of Pennsylvania Department of Corrections</u>, the court found allegations far more specific than those contained in the instant

action insufficient to support a cause of action pursuant to Section 1983.  See Outterbridge v.

Commonwealth of Pa. Dep't of Corr., No. 00-1541, 2000 U.S. Dist. LEXIS 7762, at *5-7 (E.D.

Pa. June 7, 2000).  There, the plaintiff asserted that various physicians and physicians' assistants

caused the death of an inmate by providing inappropriate medical care and ignoring his abnormal

symptoms.  The complaint indicated that there were abnormal findings resulting from the

inmate's ingestion of medication prescribed by treating physicians.  According to the complaint,

the physicians and physician assistants consciously disregarded the findings and simply refused

to act upon them.

   The court concluded that the plaintiff's allegations failed to state a claim under

Section 1983 because the plaintiff failed to allege that the physicians and physicians' assistants

knew that their conduct presented a substantial risk of harm to the inmate.  See id.  More

specifically, Judge Buckwalter stated for the court:

> After reviewing the Complaint, the Court finds that the plaintiff
> has never alleged that any of the Medical Defendants drew
> inferences that Outterbridge faced the risk of serious harm.  The
> Complaint repeats that each defendant continued to treat
> Outterbridge with INH even though he complained of its effects.
> Plaintiff also alleges that the Medical Defendants consciously
> disregarded abnormal findings results from the ingestion of INH.
> While these facts suggest medical malpractice, they do not
> sufficiently allege that the Defendants knew of and disregarded the
> serious risk faced by decedent Outterbridge.  Therefore, Plaintiff's
> § 1983 claim against Medical Defendants will be dismissed.

Id. at *6-7; see also William v. Herbert, No. 97-6189, 1998 U.S. Dist. LEXIS 9383, at *10-11

(E.D. Pa. June 25, 1998)(holding that plaintiff failed to state a claim for inadequate medical care

where his medical injury was treated by prison healthcare employees with ace bandages and pain

medication rather with the arthroscopic surgery his orthopedist had recommended); Rios v.

Sandl, No. 98-454, 1998 U.S. Dist. LEXIS 20518, at *16-18 (E.D. Pa. Dec. 1998)(granting

defendants' motion for summary judgment on plaintiff's inadequate medical care claim where

plaintiff was refused an operation to remove screws from his back, was not given a back brace to alleviate his back pain and refused Interferon for treatment of his Hepatitis C); Bednar v. County of Schuylkill, 29 F. Supp. 2d 250, 254-55 (E.D. Pa. 1998)(holding that, though plaintiff may be able to make out a claim for medical malpractice against a prison doctor who failed to diagnosis his fractured hip, he could not sustain a claim under Section 1983 because he received some medical treatment for his complaints and "[a] disagreement between the doctor and the plaintiff as to the medical diagnosis and treatment does not constitute deliberate indifference.").

Similarly, in Clark v. Doe, an inmate plaintiff brought a Section 1983 claim against a number of prison healthcare providers, alleging violations of his civil rights based on inadequate medical care. See Clark v. Doe, No. 99-5616, 2000 U.S. Dist. LEXIS 14999, at *10-11 (E.D. Pa. Oct. 13, 2000). The plaintiff, who suffered from Hepatitis C and HIV, alleged that the medical staff delayed responding to a number of his requests for medical examinations. The plaintiff also alleged that he received no medical treatment for the first 48 hours after he was incarcerated and that the medical staff refused to prescribe medication where it was found that the prescription was expired. See id. at *3-6. The plaintiff also alleged that he received two unnecessary injections while incarcerated and that the nursing staff treated his oral thrush with alcohol swabs instead of the medication he believed the physician prescribed. See id. The court found that even if all of the plaintiff's allegations were proven, they did not amount to deliberate indifference pursuant to the standard set forth in Estelle. See id. at *9-11. The court further found that the acts of the defendants were not so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. See id. The court reasoned that the prison officials considered and acted upon almost all of the plaintiff's complaints and requests in a reasonable amount of time. See id. at *10. The court granted the defendants'

motion to dismiss, holding that the plaintiff's allegations did not support a finding that he was deprived of the minimal civilized measures of life's necessities required to establish a violation of the Eight Amendment.  See id. at *11.

Here Plaintiffs cannot deny that Graff was repeatedly seen and treated by members of the dispensary staff throughout his 2002 incarceration.

Indeed, within four days of his readmission to BCCF, he was examined by two nurses.  (See Ex. W (Excerpts from Prison Medical File) at Progress Note dated 5/10/02, Medical History and Physical Assessment).  Although there appears to have been a delay in Graff receiving his medication, Graff did not question the dispensary staff, though a nurse brought medications to G Module three times a day, and did not sign up for sick call.  He also did not complain to Plaintiff about not receiving his medications.  (See Ex. LL (Dep. of Freida Graff) at 44-45).  Indeed, Graff's wife stated that he made no complaints to her during their telephone conversations.  Further, as soon as the dispensary staff realized the delay, they promptly rectified the situation. Graff was examined by a physician shortly thereafter and there were no findings noted of adverse effects of Graff not receiving his medication.  (See Ex. W (Excerpts from Prison Medical File) at Medical History and Physical Assessment).

When Graff reported falling in the shower on June 1, 2002, he was examined by a nurse on the day of his purported fall and was immediately sent to Doylestown Hospital for x-rays and evaluation.  (See Ex. W (Excerpts from Prison Medical File) at Progress Note dated 6/1/02).  Doylestown Hospital did not find that his condition warranted hospitalization, and released him to BCCF.  (See Ex. MM (Doylestown Hospital Emergency Room Records).  Upon his return from the hospital, Graff was again seen by a nurse and offered ice and Advil.  (See Ex. W (Excerpts from Prison Medical File) at Progress Note dated 6/1/02).  He was seen the next

morning by a nurse, who made arrangements for him to have his meals delivered to his cell so that he would not have to walk to the cafeteria.  (See Ex. W (Excerpts from Prison Medical Files) at Progress Note dated 6/2/02).  When alerted of his complaints of pain, the nursing staff responded.  Graff was issued ice and Tylenol and Advil were available on the module.  (See id.).  When Graff signed up for sick call on June 4, 2002, he was examined the next day by a physician who issued him Flexeril for his pain.  (See Ex. W (Excerpts from Prison Medical Manual) at Progress Note dated 6/5/02).  A cane and walker were also issued to assist him with walking.  (See Ex. W (Excerpts from Prison Medical File) at Order dated 6/5/02, Progress Note dated 6/7/02; Ex. RR (Dep. of Dunn) at 69).

When Nurse Dunn noticed that Graff did not come for his medication on June 7, 2002, she went to check on him.  (See Ex. RR (Dep. of Dunn) at 68).  Based on her encouragement, Graff agreed to take his medication.  Nurse Dunn also placed Graff on acute watch so that Graff would have assistance if needed and would have his medications brought to him.  (See id. at 70).  She also obtained a urinal and walker for Graff's use.  (See id. at 69-70).  It was Nurse Dunn's medical opinion that Graff did not need to be sent to the hospital at that time, nor was it necessary for her to contact the doctor on-call.  (See id. at 70).

With no evidence that the dispensary staff ignored any requests for care that Graff may have made or were grossly incompetent when treating Graff's medical conditions, Plaintiffs cannot satisfy their burden under Estelle.  Although the death of Graff is unfortunate, it did not constitute cruel and unusual punishment.  Plaintiffs' Eight Amendment claim therefore fails.

**D.**     **Plaintiffs' First Amendment Claim Fails.**

In addition to their Eighth Amendment claims, Plaintiffs allege that Defendants violated Graff's First Amendment "right to know" by withholding knowledge of the existence of

infectious disease in BCCF.  (See Am. Comp. at ¶ 52).  This claim fails because the First

Amendment has not been extended to the type of "right to know" that Plaintiffs assert.

 "The stretch of [the First Amendment's] protection is theoretically endless."  First

Amendment Coalition v. Judicial Inquiry & Review Bd., 784 F.2d 467, 474 (3d Cir.

1986)(quoting Richmond Newspapers v. Virginia, 448 U.S. 555, 588 (1980))(Brennan, J.,

concurring).  Justice Brennan recognized that "the right to know must be invoked with

discrimination and temperance."  Id. (internal quotations omitted).  Federal courts have

consequently interpreted the First Amendment to provide a limited "right to know," but only in

certain narrow circumstances.  See, e.g., United States v. Suarez, 880 F.2d 626, 630 (2d Cir.

1989)(finding first amendment right to know how much money is paid out of public funds); see

also In re Petitions of Memphis Pub. Co., 887 F.2d 646, 647 (6th Cir. 1989)(recognizing First

Amendment right to know what takes place in judicial proceeding).  Outside of these narrow

contexts, the courts have been unwilling to extend a First Amendment "right to know."  See, e.g.,

Virgil v. Time, Inc., 527 F.2d 1122, 1128 (9th Cir. 1975), cert. denied, 425 U.S. 998

(1976)(explaining that public's right to know is subject to reasonable limitations, especially

when individual's privacy rights at stake); Kaucher v. County of Bucks, No. 03-1212, 2005 U.S.

Dist. LEXIS 1679, at *14-15 (E.D. Pa. Feb. 7, 2005)(holding that the plaintiffs did not have a

First Amendment "right to know" of the existence of communicable disease in the workplace

because the right to know "is a public right, it is generally expressed by the press, and is subject

to limitation by the needs of individual privacy").

 In addition, the Third Circuit has recognized that courts should be cautious in

delving into the internal operations of a prison.  See United States v. Lightcap, 567 F.2d 1226,

1229-30 (3d Cir. 1977).  "Because the realities of running a penal institution are complex and

difficult, we have also recognized the wide-ranging deference to be accorded the decisions of prison administrators."  <u>Jones v. North Carolina Prisoners' Labor Union, Inc.</u>, 433 U.S. 119, 126 (1977).

Here, Plaintiffs seek to expand the First Amendment to encompass a right to know that there was communicable disease in Graff's place of incarceration.  (<u>See</u> Am. Comp. at ¶ 52).  Ignoring other inmates' right to privacy in their personal medical information, Plaintiffs complain that prison officials did not warn Graff that he was being exposed to infection.  (<u>See</u> <u>id.</u>).  Under the case law, this is simply not a cognizable First Amendment right, and Plaintiffs have not provided any basis for expanding the First Amendment right to know under these circumstances.  Plaintiffs' First Amendment claim therefore fails.

Further, Plaintiffs cannot prove that Graff was harmed in any way by Defendants' alleged violation of his "right to know."  There is no evidence suggesting that Graff contracted a contagious disease during his 2002 incarceration, nor is there any evidence that Graff's alleged exposure to contagious disease hastened his death.  With no evidence that Graff was actually harmed by his alleged First Amendment violation, Plaintiffs' claim fails as a matter of law.  <u>See</u> <u>Baker v. McCollan</u>, 443 U.S. 137, 146-147 (1979).

### E.    <u>Plaintiffs' Fourteenth Amendment Claim Fails.</u>

Plaintiffs allege that Graff's rights to due process and equal protection under the Fourteenth Amendment were also violated.  (<u>See</u> Am. Comp. at ¶ 56).[10]  They then cite to Defendants' alleged refusal of medical care, withholding of information and assistance, and

---

[10]    Plaintiffs do not assert that Graff was a pretrial detainee, who would be protected by the Fourteenth Amendment rather than the Eight Amendment.  <u>See</u> <u>Hubbard v. Taylor</u>, 399 F.3d 150 (3d Cir. 2005).

failure to protect from disease as evidence in support of their claim.  (See id.).  It appears, then, that Plaintiffs are advancing a substantive due process claim under the Fourteenth Amendment. To the extent that this interpretation is correct, Plaintiffs' Fourteenth Amendment claim fails as a matter of law because it is more appropriately analyzed under Eighth Amendment standards.

Both the Supreme Court and the Third Circuit have expressed "reluctance to expand the concept of substantive due process, because guideposts for responsible decision making in this uncharted area are scarce and open-ended."  Searles v. Southeastern Pa. Transp. Auth., 990 F.2d 789, 791 (3d Cir. 1993)(quoting Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992)).  Moreover, the Third Circuit has "stressed the importance of 'judicial self-restraint' in considering alleged violations of substantive due process."  Id.

With these limitations in mind, the Supreme Court held in Graham v. Connor, 490 U.S. 386 (1989), that a substantive due process analysis is inappropriate if a plaintiff's claim is "covered by" a more specific constitutional amendment.  See also County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998)(noting that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process"); Whitley v. Albers, 475 U.S. 312, 326-27 (1986)(finding that the Fourteenth Amendment's substantive due process cannot serve as an alternate basis for affirming a lower court's decision, independent of the Eighth Amendment, because the due process clause "affords respondent no greater protection than does the Cruel and Unusual Punishment Clause"); United States v. Hernandez, 333 F.3d 1168, 1174 (10th Cir. 2003)(finding that challenged governmental action was properly analyzed under the Sixth Amendment rather than substantive due process because that amendment provided the explicit protection the plaintiff sought).

For example, in <u>Graham</u>, a plaintiff brought his Section 1981 police excessive force claim under both the Fourth Amendment and the Due Process Clause.  The Supreme Court held that the plaintiff's excessive force claim was properly analyzed under the Fourth Amendment rather than the "generalized notion" of substantive due process because that amendment provided "the explicit source of protection against this sort of physically intrusive government conduct . . . ."  <u>Id.</u> at 395; <u>see also</u> <u>Johnson v. Ogershok</u>, 134 Fed. Appx. 535, 538 (3d Cir. 2005)(affirming district court's dismissal of the plaintiff's Fourteenth Amendment substantive due process claim because his allegations were governed by the Fourth Amendment); <u>Walker v. North Wales Borough</u>, 395 F. Supp. 2d 219, 229 (E.D. Pa. 2005)(granting the defendants' motion to dismiss the plaintiff's Fourteenth Amendment substantive due process claim because his claim was more precisely characterized as a Fourth Amendment claim).

Here, Plaintiffs' claims of inadequate medical care and inhumane conditions are more properly analyzed under the Eighth Amendment than under a substantive due process theory.  Plaintiffs' Fourteenth Amendment claim therefore fails as a matter of law.

**F.    Plaintiffs' Section 1983 Claims Against The Individual Defendants Fail Because They Are Entitled To Qualified Immunity.**

In addition to failing to prove that the individual defendants were deliberately indifferent to Graff's Eighth Amendment rights, Plaintiffs' Section 1983 claims also fail as to the individual defendants because they are entitled to qualified immunity.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>see also</u> <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999); <u>Sutton v. Rasheed</u>, 323 F.3d 236, 258 (3d Cir.

2003); Abdul-Akbar v. Watson, 4 F.3d 195, 201-02 (3d Cir. 1993).  The Supreme Court

explained the importance and reasoning behind the doctrine in Harlow:

> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.  On summary judgment, the judge appropriately may determine, not only the currently applicable law, *but whether that law was clearly established at the time an action occurred.*  If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.

457 U.S. at 818 (emphasis added).  The Court has directed that where qualified immunity is an

issue, it should be resolved at the early stages of a proceeding "so that the costs and expenses of

trial are avoided where the defense is dispositive," and because the privilege "is effectively lost if

a case is erroneously permitted to go to trial."  Saucier v. Katz, 533 U.S. 194, 200 (2001)(internal

citations and quotations omitted).

The Saucier Court laid out the standard for lower courts to follow when presented

with a qualified immunity defense.  The initial inquiry -- viewing the facts in the light most

favorable to the plaintiff -- is whether the facts alleged show the violation of a constitutional

right.  See Saucier, 533 U.S. at 201.  If a constitutional violation can be established based on the

alleged facts, the next question for the court to answer is "whether the right was clearly

established."  Id.  The Court stressed that whether the right was clearly established "must be

undertaken in light of the *specific context of the case*, not as a broad general proposition."  Id.

(emphasis added).  The test for determining whether a right is clearly established in a particular

case is "whether it would be clear to a reasonable [defendant] that his conduct was unlawful in

the situation he confronted."  Id. at 202.  Therefore, "[i]f the law did not put the [defendant] on

notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  Id.

In <u>Massick v. North Cent. Corr. Facility</u>, 136 F.3d 580, 581 (8th Cir. 1998), for example, the Eighth Circuit held that prison officials were entitled to qualified immunity against an inmate's § 1983 action.  The inmate alleged that prison officials violated his Eighth Amendment rights by placing him in a cell with an inmate who had human immunodeficiency virus (HIV) and who had been involved in a fight and was bleeding from open wounds.  <u>See</u> <u>id.</u> The inmates shared a cell for eight days, and during this time, the plaintiff came into contact with the inmate's blood numerous times.  <u>See</u> <u>id.</u>  The Circuit Court affirmed the lower court's ruling that the defendants were entitled to qualified immunity.  <u>See</u> <u>id.</u>  Reasoning that the mere assertion of an Eighth Amendment right to be free from exposure to communicable disease is not adequate, the court held that  "[t]he contours of [such a] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  <u>Id.</u>  (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).

Here, Plaintiffs cannot prove that it would have been clear to the individual defendants that their conduct was unlawful.  Indeed, the individual defendants had no involvement or contact with Graff during his incarceration and could not have known that any of their conduct would violate Graff's constitutional rights.  Nor do Plaintiffs have any evidence that the individual defendants were aware that their conduct was causing a pattern of injuries similar to those Graff allegedly suffered.  Absent such evidence, the individual defendants are entitled to qualified immunity.  <u>See</u> <u>Hartman v. Low Security Corr. Inst. Allenwood</u>, No. 4:  CV-04-0209, 2005 U.S. Dist. LEXIS 40772, at *18-19 (M.D. Pa. Aug. 24, 2005)(holding that the defendants were entitled to qualified immunity because the plaintiff "failed to show how any

named Defendant was deliberately indifferent to any serious medical need . . . In other words, [the plaintiff] has failed to establish that a named Defendant violated any of Hartman's clearly defined constitutional rights . . .").

Further, with regard to Plaintiffs' First and Fourteenth Amendment claims, it was not clearly established in 2002, nor is it clearly established today, that Graff had a "right to know" of the existence of communicable disease in BCCF or substantive due process rights governing the circumstances of his incarceration.  For this additional reason, the individual defendants are entitled to qualified immunity.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Honorable Court grant their Motion for Summary Judgment and dismiss this action with prejudice.

Respectfully submitted,

Date:  April 28, 2006

s/_____
Frank A. Chernak (Atty. I.D. No. 57602)
Jamie B. Lehrer (Atty. I.D. No. 89852)
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 665-8500

Attorneys for Defendants County of Bucks, County Commissioners Fitzpatrick, Martin, and Miller, Gordian Ehrlacher in his individual capacity, Lewis Polk, M.D. in his individual capacity, Joan Crowe, R.N. in her individual capacity, Harris Gubernick and Willis Morton

Date:  April 28, 2006                         s/_____
                                              Carla P. Maresca (Atty. I.D. No. 77568)
                                              Deasey, Mahoney & Bender, Ltd.
                                              1800 John F. Kennedy Blvd., Suite 1300
                                              Philadelphia, PA 19103
                                              (215) 587-9400

                                              Attorney for Defendants Gordian Ehrlacher in
                                              his official capacity as Public Health
                                              Administrator for Bucks County, Lewis Polk,
                                              M.D. in his official capacity as the Director for
                                              the Bucks County Health Department, and
                                              Joan Crowe, R.N. in her official capacity as
                                              Supervisor of the Dispensary of the Bucks
                                              County Correctional Facility

## CERTIFICATE OF SERVICE

I, Jamie B. Lehrer, hereby certify that on this 28th day of April, 2006, a true and correct copy of the foregoing Motion of Defendants for Summary Judgment, along with the supporting brief, was filed electronically and is available for viewing and downloading from the ECF system.  I further certify that I caused a true and correct copy of same to be served upon the following counsel in the manners indicated below:

Anita F. Alberts, Esquire
The Atrium, Suite 2 West
301 South Main Street
Doylestown, PA  18901
*(via first-class mail)*

Martha Sperling, Esquire
Silver and Sperling
107 North Broad Street
Doylestown, PA  18901
*(via electronic filing)*

Carla P. Maresca, Esquire
Deasey, Mahoney & Bender, Ltd.
1800 John F. Kennedy Boulevard
Suite 1300
Philadelphia, PA 19103
*(via first-class mail)*

Dated:  April 28, 2006                    s/_____

                                                            Jamie B. Lehrer